## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 7 |
| WILFREDO HERNANDEZ, | ) | |
| | ) | Case No. 09 B 27692 |
| Debtor. | ) | |
| ——————————————————— | ) | |
| | ) | |
| PEDRO SANTIAGO, | ) | |
| | ) | Hon. Susan Pierson Sonderby |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Adv. No. 09 A 01014 |
| WILFREDO HERNANDEZ, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————————— | ) | |

### MEMORANDUM OPINION

This matter comes before the court after trial on the Amended Complaint of Pedro Santiago against Defendant, Wilfredo Hernandez, seeking, *inter alia*, a judgment for actual and punitive damages based on fraud and a finding that the debt is nondischargeable pursuant to § 523(a)(2)(A) of the Bankruptcy Code.

The dispute between Plaintiff and Defendant involves a failed home remodeling project. In 2004, Debtor, Wilfredo Hernandez, the defendant in this proceeding, was running a construction business called Heavenly Construction, Inc. ("HCI"). He ran the business out of his home, and he was its manager and only employee. Defendant's wife, Vilma Hernandez, was the sole shareholder

of the company.  Defendant had no formal home repair training and prior to incorporating HCI in 2002, he had at most only two years of experience related to the construction trade.  He began in the year 2000, working as a carpenter and learning the trade from a gentleman named Freddie Garcia, and then from 2001 to 2002, he worked for himself, doing "handiwork."  HCI was incorporated in April of 2002.

Defendant met the plaintiff in this proceeding, Pedro Santiago ("Santiago Sr." or "Plaintiff"), prior to the November 16, 2004 dissolution of HCI.  In or about April of 2004, they had a meeting at a bank, and Santiago Sr. informed the Defendant that he was looking for a contractor to do some work on his residential building.  The building was located at 1530 N. Artesian, in Chicago, and Santiago Sr. had owned the building - - a brick two-flat with a two-car detached garage - - for over 30 years.

At the meeting, the parties discussed the work.  The meeting took place in the presence of a bank employee named "Elizabeth," who had introduced Santiago Sr. to the Defendant.  During the meeting, Elizabeth made inquiries on behalf of Santiago, Sr.; she was, according to Defendant, "acting as ... his voice."[1]  One of the inquiries made was whether HCI was licensed.  Defendant represented to Santiago Sr. that the home repair license that HCI had was adequate for Plaintiff's job.  Defendant also represented that with his experience he could do the work.

Defendant prepared a contract, which was executed by Santiago Sr. on July 15, 2004.[2]  The contract called for a "[c]omplete gut-out of both floors" and required Defendant to obtain "[p]ermits

---

[1]      Santiago Sr. is an elderly gentleman who was born in Puerto Rico and speaks little English..

[2]      Defendant admitted that he did not provide Santiago Sr. with the consumer rights brochure required by the Home Repair and Remodeling Act, 815 ILCS 513/20.

for all jobs" and "[a]rchitectural plans." Defendant testified that a "gut rehab" begins with the "tearing down" of all the drywall, the old electrical, the old plumbing, and the furnace, i.e., "all the mechanicals, which is the plumbing, electrical, heating, and air." These systems had to be demolished before work on the new systems could begin.[3] Defendant further testified that a gut rehab job would require HCI to hire subcontractors.

Santiago Sr. paid a total of $75,000 to Defendant the day after the contract was signed. Plaintiff's son, Pedro Santiago, Jr. ("Santiago Jr.") testified that his father obtained a $150,000 home equity line of credit from MB Financial Bank and borrowed $75,000 of that amount to make the payment to Defendant on July 16, 2004.[4]

Defendant began work on the project in late July of 2004. Santiago Sr. had to relocate at that time, to allow for the demolition to begin, and a tenant residing on the second floor also moved out. Santiago Sr. moved to a building on West Augusta Avenue in Chicago, where he rented an apartment for a little more than one year.

Santiago Jr. testified that he visited the property several times in 2004 and that on his third visit, in late November of 2004, the property was abandoned; there was no sign of work being done. He visited the property several more times after that, and sometime in 2005, he took photographs of many of the problems with the construction that had been performed (Plaintiff's Exhibits Nos. 6

---

[3]     Defendant was asked by his own counsel how many gut rehab jobs he had done, and he responded that he had done about 100 of them. However, on cross-examination, he admitted that he had exaggerated the amount. Indeed, he said: "I just threw a number out there."

[4]     Santiago Jr. testified that his 83-year-old father was unable to testify because of his medical condition and a problem that had developed with his memory subsequent to the transaction at issue. Again, his father was born in Puerto Rico and spoke little English.. He had worked only as a laborer all his life, having only a seventh grade education. Sometime in 2005, Santiago Sr. executed a power of attorney giving his son authority to act in his behalf in connection with the matters that are the subject of this proceeding.

through 34).[5] Santiago Jr. testified concerning these and other problems,[6] including, *inter alia*, the improperly pitched roof and water accumulating thereon, the re-use of old lumber and failure to replace rotten joists, a burst water pipe, the improper moving of the gas line, the failure to do necessary tuckpointing, incomplete and improper drywalling, nails protruding from the garage roof, failure to install seven new windows and failure to install cap moldings on windows that were installed, improper installation of a bathtub spout, failure to pull electrical wires through the conduit, failure to tear down the old back porch and build a new one, failure to obtain delivery of or to install new furnaces and air conditioning units, failure to complete installation of new floors, and failure to build new sidewalks or to install toilets, tubs, vanities, sinks, new kitchen cabinets, new doors, and new light fixtures.

Most of the work contemplated by the contract was not done. Indeed, Defendant acknowledged many of the failures and problems identified with the construction. For example, he noted the burst pipe in Plaintiff's Exhibit No. 6, the improperly placed bathtub spout in Plaintiff's Exhibit No. 7, the failure to obtain and install furnaces and air conditioning units, the failure to install plumbing fixtures, the incomplete tuckpointing, the failure to install switches and light fixtures and to pull the electrical wire through the conduit, the failure to replace windows and to install cappings on those windows that were replaced, the crack in the roofing and accumulating water, the failure to replace doors and frames, the holes in the flooring and the failure to complete the subfloor, and the failure to refurbish the stairs, tear down and rebuild the porches, and remove

---

[5]     One additional photograph, Plaintiff's Exhibit No. 35, was taken in 2006.

[6]     Santiago Jr. testified that he was employed at the St. Vincent DePaul Center in Chicago as a maintenance engineer, performing electrical and mechanical work, repair of dry wall and water damage, and, occasionally, plumbing work.

and replace the sidewalk.

According to Defendant, many of these items were not performed because they constituted what he characterized as "second phase" tasks, and he was not given an opportunity to perform them because he was not let back into the building. He testified that the contract contemplated three phases of construction, and he only got to the first phase.[7] Defendant admitted, however, that the contract does not contain any description of what should occur in each of these purported construction phases:

> Q.    You talked earlier today - - just a few moments ago - - about phase one, phase two, and phase three. The contract doesn't talk about what's supposed to happen in phase one, phase two, or phase three, does it?
> A.    No, it doesn't.
> Q.    In fact, there's no written document in this case that says what's supposed to happen in any phase, correct?
> A.    Correct.
> Q.    So when you're saying that that was phase 2 - - which most of the things appear to be - - this is based on what's in your head, correct?
> A.    Correct.

Despite the fact that most of the work contemplated by the contract was not performed, Defendant claimed that he spent even more than the $75,000 paid to him by Plaintiff. Defendant testified that he spent $80,000 and acknowledged that he obtained that figure from the $79,000 figure listed on Defendant's Exhibit No. 7 (which was not offered into evidence). Defendant further testified that the $79,000 included, *inter alia*, $25,000 in deposits allegedly paid in cash to Sunlight Enterprises, Inc., a subcontractor. Of the $25,000, $9,000 was an alleged cash deposit on account of heating and air conditioning work described in Defendant's Exhibit No. 15, $8,000 was an alleged cash deposit on account of electrical work described in Defendant's Exhibit No. 16, and $8,000 was

---

[7]    The contract merely referred to phases of payment, not phases of construction: "Payments are in 3 phases. Quotation good for 30 days." (Plaintiff's Exhibit No. 1)

an alleged cash deposit on account of plumbing and gas work described in Defendant's Exhibit No. 17. The date of the order on each of these invoices is "Nov. 2004." With respect to each of these invoices, Defendant first testified that he could not recall how the deposits were paid - - either by check or in cash. After hearing his deposition testimony that he had paid in cash, Defendant testified that all three deposits had in fact been paid in cash. Defendant further testified that he had no receipts for these purported payments and that there were no other separate records that would document the payments. When asked whether he had withdrawn the $25,000 from HCI's account at the Private Bank, Defendant testified that he could not recall and acknowledged that he had no record documenting any such withdrawal and further, that there was no other bank account. Defendant was asked: "So where did you get that $25,000 that you claim to have paid to Sunlight?" He responded, "Well, I seriously can't recall that at this time." As to the $9,000 purportedly paid on account of the invoice for heating and air conditioning, Defendant was asked whether he ever went back for a refund, in light of the fact that he never got the air conditioners or the furnaces. Defendant responded that he did not, explaining that a refund for the undelivered equipment "was far off from [his] mind" because he was "going through a lot" with the situation at hand. The court finds Defendant's testimony that he paid the $25,000 in deposits to be wholly lacking in credibility and concludes that the deposits were not in fact paid.

Another item that was included in Defendant's $79,000 figure was $11,359 in purported cash payroll listed on Defendant's Exhibits 8 and 9, which were not received into evidence because, *inter alia*, the circumstances of their preparation indicated a lack of trustworthiness.

There are other items that Defendant claimed he paid which are also subject to doubt, which the court will not belabor. In any event, it is clear that Defendant spent far less than the $79,000 or

$80,000 that he claimed to have spent.

In February of 2005, Santiago Jr. and his father prepared a punch-list of problems related to the work under the contract, and Santiago Jr. presented it to Defendant. Defendant, however, responded that he would not address any of the problems without first being paid more money.

No one has lived at the property since July of 2004. Santiago Jr. testified that it is uninhabitable; it has no running water, no heat, and no electricity. He took steps to secure the property from the elements, boarding it up with panels of plywood and adding doors and windows where necessary. In addition, he rented a dumpster and hired two laborers to assist him in removing the substantial debris on the premises.

After Defendant's refusal to address any of the construction problems, Plaintiff filed a complaint with the City of Chicago Department of Consumer Services ("DCS") against Defendant, his wife, and HCI.[8] Rupal Bapat was the DCS attorney who reviewed the complaint and conducted an informal fact-finding hearing in September of 2005. Bapat testified that Plaintiff, his son, and their attorney were present at the DCS hearing, along with an interpreter, as well as Defendant, his wife, and their attorney. Bapat further testified that at the DCS hearing, Defendant said that he had gutted the entire structure and done plumbing, electrical work, and drywall; he claimed that the building was ready for painting. As a result of the fact-finding hearing, Bapat assigned the matter to DCS field investigators.

The investigator assigned to the case was Dan Sibley. At the time Sibley testified, he had

---

[8]     A lawsuit was ultimately filed in state court as well.

been a "consumer investigator" for DCS for fifteen years.[9]  Sibley reviewed the contract and then inspected the property to determine whether the work required by the contract had been completed. He did his visual inspection in January of 2006 and determined that only about 25% of the work called for was done.  Moreover, he testified that the work that was done was inadequate and "shoddy."  For example, there were problems with the drywall, which had gaps and portions hung unevenly, and while some new windows had been installed, they were not capped.  Moreover, there was no furnace and no toilets, sinks, vanities, or kitchen cabinets had been installed; the tubs were sitting in the first floor kitchen area.

Importantly, Sibley testified that he was unable to inspect the electrical or plumbing work, because drywall had already been put up.  Indeed, drywall was hung without first having the required city inspection.  Sibley testified that the City of Chicago requires that electrical and plumbing work be inspected.  He further testified that in order to do the inspection, the drywall would have to be removed.  Defendant acknowledged that there was no City inspection of either the electrical or plumbing work before the drywall was hung.

Sibley also determined that Defendant's permits and license were not adequate for the work on Plaintiff's job.  The permits obtained for Plaintiff's job were received in evidence as Plaintiff's Exhibits No. 3 and 4.  Sibley testified that additional permits were needed, including, *inter alia*, a demolition permit.  When asked about procedures for obtaining the permits, Sibley testified that a proper license is required before permits can be obtained.  Defendant did not have the proper license. Based on his investigation, Sibley issued several citations against Defendant, Defendant's wife, and

---

[9]      Prior to working for the city, Sibley had done heating, ventilating, and air conditioning work.  The court qualified him as an expert in that field for purposes of his testimony in this proceeding.

HCI for violation of Chicago's Municipal Code, including one for engaging in the business of a general contractor without first obtaining a general contractor's license.

Bapat testified concerning the "Findings, Decisions & Order" entered by the administrative law judge on June 13, 2006, disposing of the citations in connection with a negotiated plea and settlement agreement. A copy of the order was received in evidence as Plaintiff's Exhibit No. 43. Bapat testified that all ten counts listed in the order were counts that she directed the investigators to write citations for. One of the counts was for violation of Municipal Code section 4-36-020, i.e., for engaging in the work on Plaintiff's job without a general contractor's license. Bapat explained that the general contractor's license has several classifications depending on the amount of work to be done, and there are higher fees for the higher classifications, i.e., those requiring more substantial work. She also testified that any one who is subcontracting must have a general contractor's license; a home repair license alone is inadequate. Bapat testified that the only license held by HCI was a home repair license, and neither Defendant nor his wife held any licenses at all. The work required on Plaintiff's job required a general contractor's license, and the order found HCI liable "[b]y plea" for that violation.

Bapat testified that the other violations HCI pled liable to included, *inter alia*, failure to obtain the required "limited business license," engaging in electrical work without being registered as an electrical contractor, failure to print the home repair license number on the estimate given to Plaintiff, failure to provide Plaintiff with the required consumer rights brochure, and failure to provide Plaintiff with an itemized contract, detailing the cost for each line item.

Defendant acknowledged that he had no licenses in his own name and that the only license HCI had was a homeowner's repair license. He claimed, however, that he believed the home repair

license was all that he needed to perform the work, i.e., that he did not know a general contractor's license was required.

In this regard, Plaintiff adduced evidence from two witnesses who also had contracted with Defendant for home construction work, each of whom ultimately filed a complaint with the Consumer Fraud Division of the Illinois Attorney General's office. Grisell Garcia testified that she had hired Defendant to do construction work on her home at 3528 N. Osceola in Chicago. She had met Defendant at her church and he gave her his business card. The card (Plaintiff's Exhibit No. 40) indicates that HCI does "complete remodeling, drywall, painting, electrical, plumbing, decks, [and] porches" and represents that HCI is "licensed and bonded." The card lists "Al or Kiko" as the contact, with a phone number.[10] Garcia testified that when she got the card, she believed that Defendant was licensed and bonded for everything listed thereon, including complete remodeling, plumbing, and electrical. She and Defendant initiated discussions in early April of 2004. Garcia testified that she wanted Defendant to tear down the attic of her home and construct a bedroom in its place. They reached an agreement for the work to be done for $54,000, including a $25,000 down payment. Garcia paid Defendant the $25,000 deposit on April 20, 2004, and Defendant advised Garcia that he would begin work in July. However, he never began the work; the day before work was to commence, Defendant called and demanded an additional $25,000. When Garcia asked why more money was being demanded even before the start of construction, Defendant simply responded that if she wanted an addition built, more money would be required. Garcia thereupon cancelled the contract and demanded her money back.

---

[10]    "Al" refers to the Defendant, Wilfredo Hernandez.

-10-

Garcia testified that Defendant attempted to change her mind, stating, "Just let me get started." When she refused, Defendant told her that she would not get all her money back. He ultimately tendered a personal check for $13,000, claiming that he had used the balance to pay for expenses on the project. Garcia asked for receipts, and when Defendant told her that he did not have to show her the receipts, she refused the check. She contacted a lawyer and filed a complaint with the Illinois Attorney General. After the Attorney General became involved, Garcia ultimately reached a settlement with Defendant.

Garcia further testified that in connection with her investigation, she had gone to City Hall to obtain copies of documents relating to the proposed construction on her home. One of them was a certification filed by Defendant but purporting to be the statement of Garcia's then husband, Mike Garcia. The certification (Plaintiff's Exhibit No. 50) states that Mike Garcia is the owner of the Osceola property and that he is "assuming the responsibility of the general contractor in meeting the Chicago Building Code requirements concerning the plans" and that he "will be responsible for correcting any deficiencies to comply with the Chicago Building Code." Although the certification purports to be signed by Mike Garcia on or about May 24, 2004, Garcia testified that the signature was not that of her ex-husband. Garcia also obtained a copy of the "Homeowner's Assistance Program/Chicago Energy Conservation Code - Prescriptive Package Worksheet" filed in connection with her project. That document (Plaintiff's Exhibit No. 49) also purports to be signed by Mike Garcia, but Garcia testified that it did not bear her ex-husband's signature. Finally, Garcia testified that she obtained a copy of the building permit issued with respect to the proposed construction on the Osceola property (Plaintiff's Exhibit No. 47). The permit listed her not only as the owner but also as the contractor for the project.

-11-

The other consumer called by Plaintiff to testify concerning her dealings with Defendant was Teresa Steele. Steele met Defendant in May of 2004. As with Garcia, Defendant gave Steele the business card that indicates HCI does "complete remodeling, drywall, painting, electrical, plumbing, decks, [and] porches" and represents that HCI is "licensed and bonded." Defendant also told her that he was licensed in electrical and plumbing work. Steele entered into a contract with him to do remodeling work in her kitchen and bathroom, including plumbing and some electrical. The contract price was $36,700, and on May 24, 2004, she gave him a down payment of over $18,000.

The work did not begin until August 1, 2004, and only one permit was obtained. Steele testified that Defendant asked her to accompany him to obtain the permit. That permit (Plaintiff's Exhibit No. 60) listed the "purpose" of construction as "kitchen and bath remodel" and designated the "Construction Cost" as "8,001-10,000." Steele testified that Defendant told her that they would "have to put down that he was just going to do minor work so that more permits would not be involved and that it wouldn't be a problem." Steele further testified that Defendant rented a dumpster and tore down the walls for both the kitchen and the bathroom at one time, removing everything from each of those rooms. He explained to Steele that he wanted to do everything at once so that the dumpster would not be "out there" too long; he said that he did not want to attract too much attention.

Ultimately, Steele told Defendant to stop the work on her home. Defendant had asked for an additional payment of $9,000, and she had given it to him. However, when she realized that there were problems with the work that had been done, she stopped payment on the check and told Defendant that she wanted her money back. He responded that he was not going to give her money back because he had done some work and had purchased materials. When Steele asked for the

-12-

receipts, he provided receipts that not only had materials for her project, but materials purchased for other projects as well.

Steele filed a complaint with the Illinois Attorney General. After the complaint was filed, Defendant contacted her and said that they would be able to work something out after all. Accordingly, she withdrew her complaint, but she never heard from Defendant again. Steele testified that she hired a licensed contractor to perform the work, and everything that Defendant had done had to be demolished. She ultimately paid $50,000 for the project to be completed.

Finally, Plaintiff called as a witness Frank DiGiovanni, who was qualified by the court as an expert in the field of real estate appraising and damages. DiGiovanni testified that he first performed a retrospective appraisal, which involves going back in time and gathering information to determine, on a hypothetical basis, what the property may have been worth prior to the time that construction began. DiGiovanni physically inspected the property and obtained information about it from Santiago Jr. He then considered the three classical approaches to valuation, i.e., the sales comparison method, the cost approach, and the income approach. Placing greatest emphasis on the comparable sales method, he arrived at a value of $210,000. DiGiovanni testified that this retrospective valuation took into account the fact that the property, prior to construction, had been in fair to poor condition, being outdated and needing much work.

DiGiovanni also gave his opinion as to what it would cost to make the property "basically livable" again - - to the point where the municipality would be willing to issue a certificate of occupancy. He testified to a "rough estimate" of $165,000, based on the work that he believed needed to be done. A copy of this estimate, including the itemization of work to be performed was received in evidence as Plaintiff's Exhibit No. 57.

-13-

Finally, DiGiovanni opined that the work performed by HCI had a value of between $38,000

and $43,000; however, if the work had to be torn down, e.g., to allow for inspections or because of

defects, the value of the work performed was only between $10,000 and $12,000 (which essentially

gave HCI credit for gutting the property and preparing it for construction).


## DISCUSSION

Section 523(a) of the Bankruptcy Code provides in relevant part as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual
debtor from any debt--
...
(2) for money, property, services, or an extension, renewal, or refinancing of credit,
to the extent obtained by--
(A) false pretenses, a false representation, or actual fraud, other than a statement
respecting the debtor's or an insider's financial condition;
...

Accordingly, in order to establish an exception to discharge under this provision, "a creditor must

show that (1) the debtor made a false representation or omission, (2) that the debtor (a) knew was

false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3)

upon which the creditor justifiably relied." *Ojeda v. Goldberg*, 599 F.3d 712, 716-717 (7th Cir. 2010)

(citations omitted).[11]

---

[11]    The elements of fraud under Illinois law are substantially the same.  In Illinois, the plaintiff must
establish that the defendant made a false statement of material fact, knowing it was false or in culpable ignorance or
reckless disregard of its truth or falsity, with intent that the statement induce the plaintiff to act, and which statement
was actually relied on by plaintiff, resulting in injury. *See, e.g., Connick v. Suzuki Motor Co., Ltd.*, 174 Ill.2d 482,
496, 675 N.E.2d 584, 591 (1996);  *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill.2d 179, 193, 538 N.E.2d
530, 536-537, (1989); *Borcherding v. Anderson Remodeling* Co., *Inc.*, 253 Ill.App.3d 655, 661, 624 N.E.2d 887,
892-893 (1993).

Here, Defendant made an express misrepresentation to Plaintiff during their initial meeting in or about April of 2004. As indicated above, Plaintiff told Defendant at that meeting that he was looking for a contractor. Defendant was asked whether HCI was licensed, and he expressly represented to Plaintiff that the home repair license that HCI had was adequate for Plaintiff's job.[12]

That representation was false. As indicated above, investigator Sibley determined that Defendant's permits and license were not adequate for the work on Plaintiff's job, and based on his investigation, he issued several citations against Defendant, including one for engaging in the business of a general contractor without first obtaining a general contractor's license. Bapat confirmed that a general contractor's license was required for Plaintiff's job. She explained that a general contractor's license is required, *inter alia*, whenever subcontractors are hired. Defendant himself testified that Plaintiff's gut rehab job would require HCI to hire subcontractors, and he admitted that HCI had pled liable to the citation for engaging in the work on Plaintiff's job without the required general contractor's license.[13]

Defendant claimed, however, that he believed the home repair license was all that he needed

---

[12]      Plaintiff's counsel asked: "But in that meeting, you did tell him - - you did tell Mr. Santiago - - that the home repair license that Heavenly Construction had was adequate for his job?" Defendant responded: "Correct."

[13]      Section 4-36-010 of the Municipal Code of Chicago provides in relevant part: "'General contractor' means any person who, ... for compensation ... (i) arranges or submits a bid or offers to undertake or purports to have the capacity to undertake or undertakes, through himself or through others, to erect, construct, alter, repair, move, install, replace, convert, remodel, rehabilitate, modernize, improve or make additions to any building ...; and (ii) retains for himself control over the means, method and manner of accomplishing the desired result; and (iii) whose business operations, in whole or in part, require the hiring or supervision of one or more persons from any building trade or craft, including, but not limited to, plumbing, masonry, electrical, heating, air-conditioning or carpentry. ...

Section 4-36-020 provides in relevant part: (A)    No person shall own, operate, conduct, manage, engage in, maintain or carry on the business of general contractor without first having obtained a general contractor license. The general contractor license shall be in addition to any other license required by law, including, but not limited to, the home repairs license issued pursuant to Chapter 4-204 and the excavators license issued pursuant to Chapter 4-196, if applicable.

-15-

to perform the work, i.e., that he did not know that a general contractor's license was required and accordingly, did not intend to deceive Plaintiff.

In this regard, the court notes that "[b]ecause direct proof of intent is rarely available, scienter may be established through circumstantial evidence. *Rezin v. Barr (In re Barr),* 194 B.R. 1009, 1020 (Bankr.N.D.Ill.1996). Thus, where the debtor knowingly or recklessly makes false representations that he knows or should know will induce another to act, the court can infer an intent to deceive. *Hickory Point Bank & Trust, FSB v. Kucera ( In re Kucera),* 373 B.R. 878, 884 (Bankr.C.D.Ill.2007); *Glucona Am., Inc. v. Ardisson (In re Ardisson),* 272 B.R. 346, 357 (Bankr.N.D.Ill.2001).

The court also notes in this regard that while evidence of other wrongs or acts "is not admissible to prove the character of a person in order to show action in conformity therewith," it may be admissible "for other purposes, such as proof of ... intent, ... knowledge, ... or absence of mistake or accident..." *See* Fed.R.Evid. 404(b). For example, in *Jannotta v. Subway Sandwich Shops, Inc.,* 125 F.3d 503, (7th Cir. 1997), the landlord of a "Subway" (fast food) franchisee brought a fraud action against the franchisor and its shareholders, alleging that misrepresentations had been made to the landlord during negotiations of the lease for the premises. The landlord had been assured that the lease was being executed by the parent company/franchisor, which had substantial assets and would be able to pay the rent in the event of a franchisee default. The lessee, however, was not the parent company, but a leasing agent with virtually no assets. At trial, the district judge admitted testimony - - for the purpose of showing defendants' intent under Fed.R.Evid. 404(b) - - from five former Subway landlords, each of whom explained that similar misrepresentations had been made to them during lease negotiations. On appeal, the Seventh Circuit, noting that defendants' intent was

-16-

relevant to the question whether punitive damages should be awarded, found the evidence highly probative of intent and agreed with the district judge that the probative value was not substantially outweighed by the danger of unfair prejudice. *Id.* at 517.[14]

Here, the court first notes that Defendant testified extensively at trial, both as a hostile witness in the Plaintiff's case in chief and later as a witness in his own case. The court thus had considerable opportunity to observe his demeanor and evaluate the credibility of his testimony. The court found Defendant's testimony with regard to his purported lack of knowledge concerning the licensing requirements to be utterly lacking in credibility.

Moreover, the testimony of both Garcia and Steele is highly probative of Defendant's knowledge and intent in this regard.[15] As indicated above, Garcia testified concerning certain documents that she obtained from the City of Chicago, including a certification filed by Defendant but purporting to be the statement of her then husband, Mike Garcia. The signature on the certification - - which states that Mike Garcia is assuming the responsibility of general contractor in meeting certain building code requirements - - was not Mike Garcia's signature. Garcia also obtained a copy of the building permit for the work on her property, and it listed her not only as the

---

[14]     Illinois courts have, in similar circumstances, upheld the admission of prior acts evidence. For example, in *Vance Pearson, Inc. v. Alexander*, 86 Ill.App.3d 1105, 408 N.E.2d 782 (1980), the defendant had promised to install certain truck scales on a farm by a date certain, knowing that he would be unable to meet the deadline. The appellate court upheld the trial court's admission of evidence concerning two prior transactions in which defendant had made similar promises which he did not and apparently could not keep. The court held that the modus operandi was common to the transaction at issue and the evidence also showed the defendant's likely intent and bore upon his knowledge that performance on time would be difficult. *Id.* at 785.

[15]     And the court finds that the probative value of their testimony is not substantially outweighed by any prejudicial effect - - one of the requirements for admissibility of prior acts evidence. *See, e.g.*, *Gastineau v. Fleet Mortgage Corp.*, 137 F.3d 490, 494 (7th Cir. 1998) (describing four-part test for admissibility of such evidence in this Circuit).

-17-

owner but also as the contractor for the project.[16] And Steele testified that in applying for the

building permit on her home, Defendant decided they would represent that only minor work was

being done "so that more permits would not be involved." He also rented a dumpster and

demolished all the rooms to be remodeled at once so that the dumpster would not be "out there" too

long, explaining that he did not want to attract too much attention.

The court finds Garcia's and Steele's testimony admissible under the authorities cited above

and further finds and concludes that Defendant knew he needed a general contractor's license to

perform the work on Plaintiff's home and that he misrepresented to Plaintiff that HCI's home repair

license was adequate for the work, with the intent to deceive and induce Plaintiff into signing the

contract.[17]

Finally, with respect to reliance, the court notes that reliance on a false pretense or false

representation under section 523(a)(2)(A) must be "justifiable." *Field v. Mans,* 516 U.S. 59, 73–75,

116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Justifiable reliance is subjective; what is justifiable depends

on the characteristics of the particular plaintiff and the circumstances of the particular case. *Id.* at 71;

*Bombardier Capital, Inc. v. Dobek (In re Dobek),* 278 B.R. 496, 508 (Bankr.N.D.Ill.2002). While

a creditor cannot "'bury his head in the sand and willfully ignore obvious falsehoods,'" *Bletnitsky*

---

[16]    The court notes that Section 4-36-020 of Chicago's Municipal Code provides that certain persons are not to be considered general contractors for purposes of the licensure requirements quoted above, *see* n. 13, *supra*, including: "Any person who does general contracting work on property that constitutes his primary residence, if the primary residence is a single-family dwelling or a multiple-family dwelling that does not exceed three stories in height and contains six or fewer dwelling units ... This exception is limited to one such property during a calendar year."

[17]    The court notes that even had the Defendant not *known* the representation was false, it was nonetheless made with reckless disregard for its truth. Defendant testified that when he started HCI, he did not research the city's licensing requirements. He never hired counsel to determine proper licensure, and he could not recall even obtaining for himself a copy of the licensing ordinance.

-18-

*v. Jairath (In re Jairath)*, 259 B.R. 308, 315 (Bankr. N.D.Ill. 2001) (quoting from *Zirkel v. Tomlinson (In re Tomlinson)*, 1999 WL 294879 at *12 (Bankr.N.D.Ill. May 10, 1999)), the requirement that reliance be justifiable imposes no affirmative duty to investigate unless "the falsity of the representation is easily detectable." *Dobek,* 278 B.R. at 508.

Here, Defendant admitted that Plaintiff had told him at their initial meeting that he was looking for a contractor. When Defendant was asked at that meeting whether HCI was licensed, he expressly represented to Plaintiff that HCI's home repair license was adequate for Plaintiff's job. Plaintiff thereafter hired Defendant and signed the contract. Again, Plaintiff is elderly and unsophisticated, and there was no evidence of anything that should have alerted him to Defendant's falsehood. Under all the circumstances, the court finds that Plaintiff relied on Defendant's misrepresentation in entering into the contract and that his reliance was justifiable.

For all of these reasons, Defendant's debt to the Plaintiff arising out of the fraud is nondischargeable under § 523(a)(2)(A). Moreover, the court finds that there is an additional basis for finding the debt nondischargeable under this provision. As this court noted in *In re Wizniewski*, 2010 WL 3488960, at *5 (Bankr.N.D.Ill. Aug. 31, 2010), there are usually two ways to establish fraud under § 523(a)(2)(A) in cases specifically involving contractor-debtors, i.e., by showing that the contractor executed the contract never intending to comply with its terms, or by demonstrating that he intentionally misrepresented his qualifications when soliciting the work. Here, in addition to misrepresenting his qualifications, the evidence establishes that Defendant entered into the contract with Plaintiff never intending to complete performance.

For purposes of § 523(a)(2)(A), the misrepresentation must generally relate to a present or past fact; if the promise relates to an act to be performed in the future, it is only actionable if made

with a present intention not to perform. *See, e.g., In re Brzakala*, 305 B.R. 705, 711 (Bkrtcy. N.D.Ill.

2004); *see also In re Alicea*, 230 B.R. 492, 501 (Bankr. S.D.N.Y. 1999); *In re Pawlinski*, 170 B.R.

380, 393 (Bankr. N.D.Ill. 1994).[18]  In his contract with Plaintiff in this case, Defendant promised,

*inter alia*, to obtain all permits necessary for the work.  Again, although Defendant testified that he

believed he would be able to obtain all of the requisite permits, the court finds that he knew at the

time of contracting that because of his inadequate licensure, he would be unable to obtain them.  He

also made a contractual promise to obtain architectural plans for the work.  He never did.  At trial,

when asked whether he had contacted an architect, Defendant at first said "yes."  He ultimately

admitted, however, that the man he purportedly contacted was a drafter, not an architect, and

Defendant acknowledged that he did not in any event have any documents to establish that such a

contact had even been made.  The court finds, based on all the evidence presented, that Defendant

never intended to obtain the necessary permits or the architectural plans or indeed to complete the

construction on Plaintiff's job.  Instead, he intended to spend as little as possible of the moneys

received from Plaintiff, retain the balance, and do enough of the construction to make it appear as

though a legitimate effort had been made with the intention of completing the work.  Defendant

made the contractual promises with the intent of deceiving Plaintiff, and Plaintiff justifiably relied

on them in signing and entering into the contract.  Again, for these additional reasons, Defendant's

debt to Plaintiff arising out of his fraud is nondischargeable under § 523(a)(2)(A).

---

[18]    While the general rule in Illinois is that a promise of future conduct made without intention to perform does not give rise to fraud, there is an exception to that rule where the promise of future conduct is the scheme or device to accomplish the fraud. *Vance Pearson, Inc. v. Alexander*, 86 Ill.App.3d 1105, 408 N.E.2d 782, 786-87 (1980); *see also Borcherding*, 624 N.E.2d at 893.

Count II of Plaintiff's complaint was brought under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §505 et seq., and was based on essentially the same misrepresentations as Count I, for common law fraud. As noted by the court in *Dubey v. Public Storage, Inc.*, 395 Ill.App.3d 342, 918 N.E.2d 265, 277 (2009), to state a cause of action under the Illinois Consumer Fraud Act, the plaintiff must prove: "(1) a deceptive act or unfair practice occurred, (2) the defendant intended for plaintiff to rely on the deception, (3) the deception occurred in the course of conduct involving trade or commerce, (4) the plaintiff sustained actual damages, and (5) such damages were proximately caused by the defendant's deception." *See also Peter J. Hartmann Co. v. Capital Bank and Trust Co.*, 296 Ill.App.3d 593; 694 N.E.2d 1108, 1111 (1998) ("(1) the commission of a deceptive act or practice; (2) intent on defendants' part that plaintiff rely on the deception; and (3) ... the deception occurred in the course of conduct involving trade or commerce."); *Borcherding v. Anderson Remodeling Co., Inc.*, 253 Ill.App.3d 655, 660, 624 N.E.2d 887, 892 (1993) ("(1) a statement by the seller; (2) of an existing or future material fact; (3) that was untrue, without regard to defendant's knowledge or lack thereof of such untruth; (4) made for the purpose of inducing reliance; (5) on which the victim relies; and (6) which resulted in damages"). In *Siegel v. The Levy Organization Development Co., Inc.*, 153 Ill.2d 534, 607 N.E.2d 194 (1992), the Court noted that "[i]n superimposing the elements of the two causes of action and holding them up to the light, it is unquestionable that so long as the alleged deception occurred in a course of conduct involving trade or commerce, facts satisfying a claim for common law fraud will necessarily satisfy a claim under the Act." *See also Washington Courte Condominium Association-Four v. Washington-Golf Corp*, 267 Ill.App.3d 790, 643 N.E.2d 199, 222 (1994).

Here, Plaintiff has established by a preponderance of the evidence that Defendant's unfair and deceptive acts and practices constituted fraud under Illinois common law,[19] and he has also established that Defendant committed that fraud while engaged in trade or commerce. Accordingly, Plaintiff has established fraud under ICFA.

With respect to damages, the court finds that the best measure in this case is what it would cost Plaintiff to hire a contractor to correct the many defects and make the property livable once again. The court notes that prior to the fraud practiced upon Plaintiff by Defendant, Plaintiff's building - - though outdated and in need of work - - was livable, and indeed, Plaintiff resided in the first floor unit, and a tenant resided in the second. At that time, Plaintiff was in a position to proceed with a complete gut rehab of his building, having arranged access to a $150,000 line of credit with MB Financial Bank. However, after paying $75,000 to Defendant, Plaintiff is now left with an uninhabitable building, without heat, plumbing, or electricity, and he no longer has access to the line of credit, the account having been frozen.

Plaintiff adduced the testimony of DiGiovanni, who gave his opinion as to what it would cost to make the property "basically livable" again - - to the point where the municipality would be willing to issue a certificate of occupancy. He testified to a "rough estimate" of $165,000, based on the work that he believed needed to be done, which included all the necessary corrective measures. The court finds this amount to be a reasonable approximation of the damages sustained by Plaintiff in this case.

---

[19]    The plaintiff's burden in this action under § 523(a)(2)(A) is proof by a preponderance of the evidence, *Grogan v. Garner*, 498 U.S. 279 (1991), notwithstanding the more exacting "clear and convincing" burden required to prove fraud under Illinois common law. In this regard, the court notes that Plaintiff's proofs satisfied the more exacting Illinois standard in any event.

Plaintiff has also requested punitive damages and attorney's fees. As the Supreme Court held in *Cohen v. de la Cruz*, 523 U.S. 213, 221 (1998), the language of § 523(a)(2)(A) excepting from discharge "'any debt ... for money, property, services, or ... credit, to the extent obtained by' fraud encompasses any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor." *Id.* at 223. While punitive damages may be available in a fraud case as well as under ICFA, the Seventh Circuit noted in *Roboserve, Inc. v. Kato Kagaku Co., Ltd.*, 78 F.3d 266 (7th Cir. 1996), that punitive damages are ordinarily awarded under Illinois law only in exceptional circumstances involving outrageous conduct. The Court stated:

> "Illinois courts do not favor punitive damages and insist that plaintiffs must establish 'not only simple fraud but gross fraud, breach of trust, or other extraordinary or exceptional circumstances clearly showing malice or willfulness.'" ... In *Cornell* [*v. Langland,* 109 Ill.App.3d 472, ... 440 N.E.2d 985, 987 (1982)] the court explained: "The awarding of punitive damages originated as a means of punishing defendants in instances of malice, oppression or gross fraud, *i.e.,* where the manner of performance made the conduct outrageous." ... 440 N.E.2d at 987. To justify punitive damages, the allegedly outrageous conduct must "involv[e] some element of outrage similar to that usually found in a crime." Restatement (Second) of Torts § 908, comment b (1979); *Loitz v. Remington Arms Co., Inc.,* 138 Ill.2d 404, ... 563 N.E.2d 397, 402 (1990). And without evidence of gross fraud or some exceptional circumstance clearly indicating malice or willfulness-if the evidence demonstrates only a garden variety fraud-under Illinois law the question of punitive damages is not even submitted to the jury. *See Home Sav. & Loan Ass'n of Joliet v. Schneider,* 108 Ill.2d 277, 91 Ill.Dec. 590, 593, 483 N.E.2d 1225, 1228 (1985) ("deceit alone cannot support a punitive damage award") ...

*Id.* at 275-76. (certain citations omitted).

While in this case, fraud was clearly established, the court does not find that it was so gross as to warrant punitive damages. The court is cognizant of the evidence adduced by Plaintiff concerning prior transactions in which Defendant practiced similar deceits upon other consumers.

Nonetheless, the court does not find such extraordinary or exceptional circumstances clearly showing malice and intent to injure as would warrant an award of punitive damages, in addition to the compensatory damages awarded herein.

Finally, Plaintiff requested an award of attorney's fees. Attorney's fees may be awarded under ICFA to the prevailing party, *see* 815 ILCS 505/10a(c), and the award rests in the sound discretion of the trial court. *Majcher v. Laurel Motors, Inc.*, 287 Ill.App.3d 719, 730, 680 N.E.2d 416, 424 (1997). The factors that courts consider in making the determination whether fees should be awarded include the following:

> the degree of the opposing party's bad faith; the opposing party's ability to satisfy the fee award; the deterrent value of a fee award; whether the party requesting fees sought to benefit all consumers or businesses or to resolve a significant legal issue under the Consumer Fraud Act; and the relative merits of the parties' positions.

*Id.* (citations omitted).

Here, although Defendant acted in bad faith and the merit of his position was considerably less than that of Plaintiff's, his ability to satisfy any award of fees - - in addition to the relatively substantial award of compensatory damages - - is likely quite low.[20] Moreover, while an award of fees may add some deterrent value to that already provided by the substantial compensatory damage award, the suit was brought on Plaintiff's own behalf and was not brought to resolve a significant legal issue under the Act. Under all the circumstances, the court exercises its discretion to deny the requested fee award.

---

[20]    The court notes that Defendant is a chapter 7 debtor, and a no-asset report has been filed by the trustee in his bankruptcy case.

-24-

## CONCLUSION

For all of the reasons set forth above, Plaintiff is entitled to a judgment in his favor and against Defendant in the amount of $165,000 on the Amended Complaint, and that amount will be held nondischargeable under § 523(a)(2)(A). This opinion constitutes the court's findings of fact and conclusions of law under Bankruptcy Rule 7052 in connection therewith. A separate order will be entered pursuant to Bankruptcy Rule 9021.

Dated:                                          ENTER:

**2 5 JUL 2011**

Susan Pierson Sonderby
United States Bankruptcy Judge

-25-